*346 Opinion op the Court, by
Ju*dge Minns.
ON the 28th of November, 1789, Charles Ewing contracted to sell to James Handley, two hundred and fifty acres of land, then demarked, and executed his bond with a penalty, binding both himself and his heirs, conditioned to convey the said land, “•by a sure and suffi-c'en^- deed in fee-simple, as soon as a patent could with convenience be obtained for the same; and also, to keep *347 kj^afd Bandlfey in peaceable possession oí the samq.” "adley aftemaEds."l$ok possession thereof and settled áls sonAh.ere.on jaSd gave' hi nr only- a verbal- grant, permitting him to hold it as a quasi tenánt -at will, and his Ion still -resides thereon. Máhy years afterwards, Ew-ihg being-embarrassed, departed -from that section ‘-of the country,"never having made- a conveyance, and in 1804, Handley commenced a suit at law upon said- bond, ’assigning as a- breach, ttiejion-conveyance- of the land. '.After this suit was prepared for triajj- Ewing died.,- A scire facia#- to revive it was issuedb’against- Nathaniel -Wickliffe, Iris-administrator, who pllfctdedthat no assets bad..eVer come to his hands. A verdict- was found- for $-l,-GOO in damages, and a judgment rendered against the administrator for the amount, to be levied of the goods and chattels which were of said decedent at the time of-his death, and which should thereafter come: fo the hands of his administrator, to be administered.- " In the-year 1811, James Handley filed this bill in the Nelson circuit court, against the heirs and administrator of said Ewing, charging that since the judgment, the ad-ministrátor had received assets and divers- sums of mo- ■ ney, which he could- not prove without a disclosure, and w.hich he claims in satisfaction of his judgment. He also alleges, that at the time he contracted with Ew-mg,. he,- Ewing, was possessed of a negro woman, Hannah, as.of his own proper estate, who had npw Qj&iidren, and that said Ewing still possessed, her as his own, until the d^ath of his first wife, about the year -1-804, and for some years afterwards, when Ewing,, to av.oid. a /prosecution, left that section of the country, and then Charles Wickliffe, the father-in-law of Ewing, being the father of his deceased wife, set up claim to these slaves, as his, and that he had only lent them to his daughter after her marriage, which took place in 1-786, and by some address, got possession of and still re■tains them-; and that the administrator of Ewing, to favor the children of his deceased sister, being a son the said.Charl.es Wi.ckjiffe,. or having a-hope to them- as part of his father’s estate, would not take possession of them or claim or recover them, as part of the estatfr.of the decedent to which they rightfully belong--e'd-,-.lest-the creditors should get them. He also.charges, -that Hwiugvdjed possessed- of considerable real estate, of ..whicfetie prays a discovery.from the heirs, and al *348 leges, that the administrator has filed'his hill against-the heirs, to subject it for other debts which, he-claimed; but that his, the said Handley’s, was of superior dignity, and .claims that it should be first satisfied. He made t{je administrator and heirs 'of Ewing, and the said Charles Wicklifib, defendants, and prays the satisfaction of his and for relief,
tWWditor’ m-ay file a bill! ‘ft? chaupery,', ductionof as* sets,
guo;i ro ceedingis ia-dispensable, wherever conveyances which prevent, the_ property by the, admlnis-trator, who, the fraudu-' lent party, suit under the statute a-frauds ¥.erJunes*-
A-n -appllca-. tion' by defend ants, to ^íSion^f ^'a suit in chan* cei7 ag^ng* ¡slí™ and the causereinsta-ted, ought to i? the^com"’ plainants agree to do, in anoth'erlegal wilí’produce effects equally advanta-applicants! 6
Averdictand 'gainst"an ad-níínistrator, is, as far as personal ^ slaves may be affected, pri-ma fecie evi-the heü:sMnSt
The heirs bin in equity, reduce the judgment in showingSthS it was° for more than it unless they0’ make out such a case tif ''its'reduc” tion,1 on a bill filed by the adm’r. alone,
If any inter-estin a chattel vests in a erture, aliifo1' a particular, dke^iagd,.. so thatiip'y the^sbanl during -the-of the _ -.wanBerojigto the1 busbaftd;-in case by f ^“’’^Jnhisadí ministrator.
*348 The heirs answered, setting ou t a list of laiids as given *n Ewing for taxes, but exhibit no1 title papers", They contend that Handley toek possession of the land from their ancestor, and by his son, still holds, and will noj; surrender it to them, and that before he should have the aid of a court of equity to enforce his claim, he ought to be compelled to do equity, by surrendering the possession and accounting for rents. They aver that *be verdict and judgment of Handley, were far loo high, being the value of the land at the time of rendering the verdict, instead of the value paid when purchased, wbich was far less> and which they pray Handley may be compelled to disclose in response to their answer, which they make a cross bill; and they insist, that as they were not parties to the judgment against the administrator, they have now a right to contest it, and that the administrator was absent at the trial at law, an(j that Handley caused a fraudulent representation of va^ue to be given to the jury. They allege that the two hundred and fifty acres sold to Handley by their ancestor, was located, in the name of their ancestor’s relative; and that their ancestor was entitled to half for location, by the custom of the country, and also by a written contract between their ancestor and his rela-^ve ’ an^ that having located other claims, in the division, the whole tract of one thousand acres, of which the two hundred and fifty acres sold to Handley was part, tbeir ancestor; but that the written contract was so lost or mislaid, that they could not find it. They aver that the relative of their ancestor in whose name claim is, is dead, and that his heirs are unknown to them; and they make them defendants as unknown heirs, and pray that they may be compelled to convey to them, and that Handley may be compelled to accept a ^rom them, which they are willing to give with any security, or that he may be compelled to surrender the possession, if he will not take the title.'
He is entitled to heF co^tin-mucl^as'-io any other property.
0j,y. dren may claim a tie-[¿e%™c/ipC tion of cM-dren; but it children,
s.ofJ barrel & wife for life,witká p°g¿®r ° f ^is" themS anfong-their chip cl>'en '!uriao , at their ¶ 01 death, in Such manner 'as • continued loan for more than 5 years, to one of the children, rendered such slaves .liable fot the debts of such child, to the samé extent they, would have been, if the power had been executed formally by gift.
*349 ¿Uparles Wickliife-answered the .hill,, and .'.stages (im $$ming what is set forth in-his. original-,-ápd. amended Answers,) that beheJd-Harmah and her children under 4he will of Martin Hardin, his wife’s/siather,.-recorded in Virginia in 1780, and written -in 1779y0>nly two sections-of which need be recited, as having any bea-ripg on thiseorM-oversy, to -wit: . ,
“ Item, ! give and bfequeath to my daughter, ’ Mary Wickliffe-,- all that .personal estate that I -lent her,«soon ter her marriage, negroes excepte^ idem I lend, to her and her-husband; Robert Wickliffe, daring their natural lives.. But if the said Robin Wickhffeshould sell, mof t-gag,e, or convey away any of the said slaves, or any part of the said slaves, in order to defraud the right heirs of them, the said negroes, to wit, Slate, James, Sarah and Nan, or their further increaae, then I gnp. power .my executors to sue and recover such slave or slaves, so sold, mortgaged or conveyed away, for the use of the right heirs, and to take the remainder out of his hands.. But if my daughter, Mary Wickliffe, should have a child or children, I give the said negroes to that child or children, to be equally divided amongst them; and for want of such issue, I give them to Charles and Lydia Wickliffe’s children, to he equally divided Amongst them. Also, I give my daughter,.Mary Wick-liffe, twenty pounds, lawful money of Virginia.”
Item^ I give and bequeath unto my daughter, Wickliffe, twenty pounds current money of Virginia, and no more. Item, I leave my daughter, Lydia Wick-, liffe, and-her husband, Charles Wickliffe, four negroes, that they now have in their possession, to wit, one negro woman named Frank, commonly called Fanny, and her two children, also, one negro girl named Anna, and heft farther increase, during their natural lives. 1 also give the said negroes to Charles and Lydia Wickliffe’s children, to be divided discretionally amongst them, as the,’said Charles Wickliffe and Lydia, his wife, shall think fit, and at what times.”
He, said Charles Wickliffe, states that his daughter, Ewing, was married in 1786, and that he was absent in Virginia ip 1787, and his wife, Lydia Wickliffe, who is stiMiving, sent Hannah, who was the oldest child of Fanny, named in the will, to aid her daughter, Ewing, which he disapproved of, on his return home, and ini 79 -1, he re claimed-the possession of Hannah and sent others in *350 her place., and- then returned Hannah ünloan; but, ne* vcr, at any time, permitted her to stay so long-without reclaiming her, as to give Ewing a .title ,by five years’ possession, or to subject her to the debts of-Ewing by the same length of time; and'insists that he and his wife never did assign her or her increase to.Ewing or- his wife, under the will of Martin Hardin;'and alleges, that he permitted her to stay at'Ewing’s after the death of his daughter, Ewing’s- wife, barely to take care of his grand-children, for whom he then and yet designed these slaves.
To avoid the effect of -ionmide? an unrecorded loan, the re-slaves°to^the real owner must be in such a public -manner” as will leave no doubt in Mss^sionex-■fsts. ° ,
morol^le daring s'lavos -ivjhich are not ifoffheacT ministrator assets in his h^nds,is .de-oughUo subject such property to and,cfe-tógt fh® & aónwiey.alf^.-surrender-
*350 The administrator of Ewing demurred to the bill,.after, by way of answer, denying fraud in general terms. The court overruled this demurrer and directed an answer. In his answer, he alleges that the estate of Ewing was indebted to him for money paid as the. 'security of Ewing, and to recover that, he had filed his bill-against the heirs. He admits that he was warned by the scire facias, of the pendency of the suit at law against him, as administrator of Ewing, and that the suit was at 30 great a distance from him, in Henderson county, he wrote to a lawyer, and did not attend himself, anc® w5ls unacquainted with the transaction; that Hand-ley procured a verdict for too great a sum, by proving the then value of the land including (he improvements. ca^s uPon Handley to slate whether he did not Prove the value including improvements, and what was the consideration given by him. He alleges that the cpn-tract was made by Ewing in good’faith, he claiming the as l°cator: but had not been able to obtain it, until-the suit was commenced; and he requires the verdict to be reduced to the proper standard. As to assets having come to his hands, he states that there are none that have come to his hands, but what have been fully paid away; and that if the complainant will examiné *be recor<ls °f the county court, he will find the estate indebted to him, and since that settlement no funds have come-to his hands. He alleges that none of,the slaves *n con^es^ ever carr'e to his hands, and were in the possession of and claimed by others, and he did not consider it incumbent upon him to commence suits for them as administrator; that he had no vouchers or papers to show that they belonged to the estate, which wouldju-sr tify. his bringing «suits and incurring costs, to establish at best a doubtful claim, and one jnwiiich he must, in. *351 „ *baMity:, be defeated. ’-He itey should-b’eígonápe'lled tó surrender. ;tpé'laird-bfe-' jfe'he obtatned;i?éUéftv' \ -•/
dx^cutdr pówfef4fc ¿v', •, h-ais%a ^®-* ney“ 'kqtmC>“ where these" a.con-ancestor for* land or mo->•“.the al« hf’one gr 0f all the o> t^c®“c*1scon' t0 depend on the impossi-la.n,l ° am“’
Where one of petitión-edthat a suit in which they p^inants1' ¡hould be’dismissed, & the t^aUt should proceed, held thatthecourt dismLs?it°as questions were involv* ed in the application ■Which ought not to be de-■.■(oidcd'on ®b-tíjé’á or fifra-atron. ’'
*351 -^Handley ílnj|i|@réd- theinterrogatori'es',placed in the ánswer»bjr:thélWfohdants as a cross-bill,(®y admitting. that he paidjsfotHhe land purchased, lay him of -Ewing, inpropeííyíüt'-thafearly day of cash value;; that gave fosdt’about one dollar or one dollar and -©he half per acrepwhioh, he: could hot be certain; ánd he proVéd' and" recovered its value at the date of -rdcovr er.y, but without improvements, when,;the administra-to to-rappeafe#by' counsel' and made f^Ú-defence; rests Oh-the verdict and judgment as á-bar to. further quiry-ondhtsisubject. He insists- thát Ewifig'-s’olcl jand to which he had no title, and knew it at- the and* denies that there was any title in -Ewiri|f;as locator,' er-in-his-relative, for whom they*allege the land was; lq-catedjíóE'-'that Ewing'¿ver had any writing or claim for ityi-addyofcourse; was guilty of á fraud - which subjected- his éstate to the full value at the -time of as-sessprerth. He alleges that the heirs of -that velaltivé are ksovrnijfcf the defendants in that court, and lattqniand residents of this country; and fha't ceedings against them as unknown, are all a device to get aLarpratended title, without-permitting these to;contest it. He avers that-, he is willing .to ■ take a good, indisputable title, and- release- his judgment, if if oa-n-po conveyed.-. He denies- that he -Or -his;"son,- is baund to pay rents or account for profits, or to .restore fhedapd-, except to the right owner; and that the - heirs oftyllw-ingliave no right or title thereto.
- After.dhe'coming in of the ariswer of Charles Wick-life,pE rather his amended answer, which disclosed the.vuilbof- Martin Hardin, the maternal great grandfather, of the present heirs *of Ewing, the said Handley amended his bill, and caught at another family of ne-groes, stating that some time after the death of Martin Hardin, Robert Wickliffe, his son-in-law,' named in the will, also departed this life, childless, and also ¿nape his wilj, devising the said negroes bequeathed to his wife, Mary Wickliffe, in the same manner that they were directed to pass by the will of Martin Hardin, except one; and that as the said negroes, by the said latter will, were directed to go to the children of Charles and Lydia Wickliffe, in case the said Robert and Mary had no *352 •children; and as Mrs. Ewing, formerly Miss Wickliffe, the mother of -the present heirs of Ewing, was living and of .the age of eight or ten years, and was one of the childtenof said Charles and Lydia, the inttfest in her on the failure ¡of the issue of Robert and Mary Wick-liffe, became. vested and not contingent, before her marriage with Ewing, and as he survived her, the said vested interest belonged to him and was subject to his < debts; a»d that Mary Wickliffe had afterwards married, and lately, since the death of Charles Ewing, had departed this life, whereby her life estate was terminated; and;,t{iat, about, forty negrees then were -divided between the. children of Charles and Lydia Wickliffe, and tfaat-fttejshare ofthe heirs of Ewing in this division, amounted to ‡ 1,060, which he alleges is subject to Ewing’s debts; and. that-the administrator would not, in the same collusive manner, recover and receive those slaves, and subject them to the debts of Ewing.
Of rents, profits, improvements, Sic.— Vide, post, 2d opinion.
. The heirs of Ewing again answered, admitting that they had, on the death of Mrs. Robinson, late Mary Wickliffe, received sundry negroes; but they allege -that they received and claim them under the. will of ; Robert Wickliffe, and contend they are not, and never -were,subject to Ewing’s debts.
The court.below, on a final hearing, decreed that the slaves which passed by the will of Martin Hardin to Robert and Mary Wickliffe; and whicb, onthedealh of both of them without issue, came to the ’heirs of Charle^Ewing, and also negro Hannah and her nine children, which were in the possession of Ewing in his lifetime, should be assets in the hands of the -said Charles Ewing’s administrator, subject to the payment of the common law judgment, which the bill was brought to enforce, and that the defendants should-pay the costs. *
From this decree the defendants below have appealed, and now assign various errors in the decree and proceedings of the court below.
The^first of these, which we shall notice, is that which complains of error in the court below, in overruling the demurrer of the administrator of Charles Ewing, to the hill of the complainant. It has been contended, that the bill shows no ground for an application to a court of equity, and that the remedy at law was so plain and easy, that an execution on the judgment might have been *353 issued at once. We are aware of no law which: would permit an execution to be issued on this judgment of Handley, without first issuing a scire facias, suggesting that since the commencement of the suit at law, assets had come to the hands of the administrator; and if, on the trial thereof, it should be judicially ascertained, by a judgment on default or an issue found for.the plaintiff, that such assets had since come to the hands of the. administrator, judgment might be rendered that the plaintiff have execution of his original judgment. Such is the mode of effectuating all judgments rendered, to be levied de bonis quanclo acciderint. If the suggestions,' or rather allegations, of the complainant below, be true in this instance, that he was unable to prove the amount, without a discovery, what benefit could he have derived from a scire facias at common law?
A bill of discovery of assets, in favor of a creditor, belongs to a class of bills not unusual, and, indeed, well known to a court of equity, and this bill is entitled to that rank. Eesides, if an administrator will not take into his hands, or recover by legal process, goods and chattels which he might, what redress has a creditor holding a judgment de bonis qnando a,odder int, in a court of common law ? He must, on. the trial of the issue whether goods have or have not come to the hands of the defendant, show that he has received them, and it is not sufficient to show that the administrator could, if he would, have gotten them. An application to the chancellor, then, may, in this case, be proper. It frequently may happen, that the testator or intestate has encumbered his estate'with some fraudulent conveyance, which may be valid against himself, and also against his personal representative, who claims under him, but yet be void as to creditors. Here, the administrator could not recover; but ought the creditor to be compelled to stand by, equally silent, when the deed is void as to him, and not be allowed to resort to a court of equity? In this case, the slave Hannah, and her offspring, might be liable for the debts of Ewing, although only loaned to him, and not regained for five years, by demand or due process of law, under the statute to prevent frauds and perjuries, 1 Dig. L. K. 618; and yet his administrator might not be able to recover the slaves from Charles Wickliffe, upon the five years’ pos . *354 session of his intestate; because that possession wa# amicable, and not adverse. Indeed, Charles Wickliffe might recover the slav'e from the administrator, if he held the possession, the statute of limitations notvvith-standing, and yet the slave he subject to the debts, of Ewing, because of the five years’ possession, which gave him a delusive credit. Under such circumstances, a bill in chancery would lie, as the proper remedy to reach the fraud, and no proceedings at law against the administrator, could reach the slaves. For these reasons, we view this-bill as making out good grounds for application to a court of equity, and conceive the demurrer of the administrator, as he was a proper party to all such controversies, as properly overruled.
The next question we shall notice, .arises from the following circumstances: After the answer of Charles Wickliffe, and the amended bill of Handley, claiming to subject the slaves derived from Robert and Mary Wickliffe, and the answers thereto, the complainant dismissed his bill as to the heirs of Charles Ewing. They aftferwards presented their petition, alleging that their interest would be materially affected by the dismissal, and relying on the proofs in the cause, prayed the court, by order or decree, to direct the complainant again to make them defendants, or to consent to reinstate the cause as it stood before the dismission, by a day fixed by the order; or, in .case of failure, that the court should suspend the trial or dismiss the bill without prejudice. The counsel for the complainants agreed that they should be made parties, and that the cause should be heard upon the preparation as it stood; and upon this offer, the court overruled the application, and the heirs of Ewing excepted.
According to the original shape of the cause, it may be doubted whether the heirs were properly made parties to the contest for subjecting their la.nds. If they held lands by descent, the bond in this case expressly bound tliem; and although the bond is dated before lands were subject to sale by fieri facias, yet they could be subject to an elngit, and suit at la'w might have been brought against them on the bond, without joining the personal representative. Hence, because the remédy-at law was complete, the right to proceed against them in equity may be questionable, especially as the bill profeses no ignorance of th'eir title. But after the *355 elfi-Ipas set up,-against them for the slaves derived from ,|®&ert TWickliffe, as they held the possession of them, Jvheyj were proper defendants, and ought to have been fcoptinued.,¿|But still, we do not perceive any advantage that they Could have had, by the court making the order required, over the attitu.de in which they were placed.,by -the consent of the opposite party». So far as they required Handley to surrender the land-, their cross bill y;a$:adequate- for their redress, which* according to, tlie-.decision pf this cotsjf, in the case of Wilson's heirs vs. Bodley, 2 Litt. Rep. 55, was not dismissed without their election, on the dismissal of the original bill brought by their, adversary. The consent, then, to make them parties, which they embraced, raust be construed as giying them, additional advantages, and to place them in sneh an attitude as to enable them to protect their interest in every respect.. We, therefore, discover no error in refusing the order or decree required- by their petition, after what was granted to- them by consent.
The next error assigned-, contends that the court err- . e.d in not reducing "this judgment to the purchase money and interest given for the land sold,- instead of its present amount. As to the administrator, he has made out no sufficient grounds for such a reduction. . He did not attend the trial at law, barely because it was- inconvenient on account of the distance. He professes ignorance about the controversy;- bu.t this arose from his -never having looked into the papers of the suit at lawt sffixdiscover what was demanded." Of course, the ver-,diet as to him, ought to be conclusive. We .are unwil--•lipgiitp'admjt, that this verdict and.judgment are entitled t.omo^vseight against the heirs, so far astheyhavei^- - terest-in the slaves in contest. It is not necessary that wa-shou-ld now enquire into the precise weight which a verdict and judgment against administrators ought to’ have against heirs. They are certainly entitled to some, ,as. to the .personal estate, and that cannot be less thanprv mafacie, aud what is done in the suit against the administrator ought to be .presumed to.be rightly d-one, and as tí-hey have shown no fraud in obtaining the-judgment, •«ranci^np,; excuse ffir the default of the administrator, they. -«Sialghfe-nph to’be excused from its effects, at least on chat.-tel^nckslayes. .
- if5ftf§n?xf:(West*0ó we notice, is, the liability of tí$e>*&u?$p$paé slaves- de.vised by the- will of Martin *356 ¿in, to Robert and Mary Wicldiffe, during their lives, and then on failure of issue, to the children of Charles and Lydia Wickliffe, of whom the. wife of Ewing was one. i '■
331*? 3 Litt" Rep. 275-. *
It is well settled, as contended in ’the argument, that if any interest, in a chattel vest in a female before-or during coverture, although a particular estate may exist undetermined, so that no possession is acquired by the husband during the life of the wife, the, right will belong to the husband in case he survives, and pass to his administrator; and it is said further, that he i? entitled, by a series of decisions, even to her contingencies, as much as to any other species of her property; that the right of administration follows the right of the estate, and ought, in case of the husband’s death, after the wife, to be granted to the next of kin of the husband; and that if administration is granted to a third person, he is a trdstee to the representative of the husband. Jacob’s Law Die. title Baron and Feme; Pinkard's executor vs. Smith, Fall Term 1821; Banks vs. Marksberry, present Term. If, then, these negroes vested in the wife of Ewing on the death of Robert Wickliffe, or she comes within the description, as the bill seems to suppose, there could be no difficulty in this case. But this is not the fact. It was not to the child or children of Rbbert and Mary Wickliffe, that these slaves were directed to pass by the will of Hardin, after their life estate was determined. If it was, it might well be contended, that the possibility of issue became extinct at his death. But it was to the child or children of Mary Wickliffe that the slaves were to pass; so that any child which she might have by any other husband, would have been entitled. Of course, the death of Robert Wickliffe did not secure the children of Charles and Lydia, or produce the contingency by which the estate would vest m them, and the’event was postponed until the death of Mary, which did not happen until after the death of both Ewing and his wife. The inquiry then is, was the legacy to the children of Charles and Lydia Wickliffe, which did not depend upon a condition, but on an event «’holly uncertain, to wit, the existence of. the offspring of Mary Wicldiffe, of such character that it would pass to the next of kin to Mrs. Ewing 1 If it would, the representative of her survivinghushand, wpuld take it; if it would not, then there-is no pretext *357 íbrsubjecting it to ® debts of Ewing. The solution offlhis question, involves the further construction of the will of Martin Hardin, • ,
, The testahfrpould not mean the children of Charles and Lydia Wickliffe, which would be alive at his death; for then the life estate of Robert and Mary Wickliffe; might not be determined. He must have intended the children which,should exist at the death of Mary Wick-liffc,¥§ the persons who should take. Had he spoken ofhthe children which were alive at the making of the will, or those alive at his death, then Mrs. Ewing would have been identified as one which would take on the happening of the contingency, as if she had been named^ hnd'it might have been contended, that on the happening of the contingency, her representative would take* But as the intention was to designate thé chil- ■ dren living at the death of Mary Wickliffe, Mrs. Ewing didmot live until ‘that event, and, therefore, she is not de'scrjbhd in the will, and the legacy to her was lapsed, or to speak with more propriety, went to such ns did exist át the death of Mary, exclusively, and no representative which she might have, could answer the descrip-tiorl of children then living. It is, says Roper on Wills, (pH2j) settled, that anyperson who can entitle himself' undéf the description,at the time of distributing the fund, viz. áá well those children living at the period of dis-frib’ution,'though not born until after the testator’s decease, as those born before and living at the háppening of ¡the event, will be permitted to. take. It may be said, thát’the children of Mrs. Ewing, alive at the death' of Mary Wickliffe, could fill the description of children ófChÉríes and Lydia Wickliffe, although they were graftdjchildren. It is true, grand-children are fre-qiíemííy inchided within the term, children; but this is where' there' are no children. Cunn. Law. Die. title Children.. Besides, this would not help the complainant; for those grand-children would lake as legatees, and'hot as representatives of their mother, in which case, the property could not be subjected to the debts of ihe'falher. There is, therefoyigerror in so much of the décrée of the court below, as-sulyécts these slaves.
We'have not thought; it proper to enquire into the tenure of these slaves, under the will of Robert Wick-liffe, by which both’bill and answer allege they’passed; because, first, we do nofperceive under the proof, what *358 power Robert Wickliffe had to devise these slaves, if he held them under the'will of Hardin; secondly,- it.is alleged that the will of Robert Wickliffe made the same disposition as that of Hardin, and, therefore, ‘cán* have no effect; and lastly, this will is not-Jled in the cause-, and we do not think it proper to disturb the' possession of an estate, by following the terms of an instrument which we have not before us.
Having disposed of the slaves which came through 'Robert and Mary Wickliffe, we pass on to the family'of Hannah, the child of Frank or Fanny. Here it has been strenuously urged, that, as by the will of Martin Hardin, this slave, mother of all the rest, was devis’ed to Charles and Lydia Wickliffe for life, with power of disposing of her to their children when they pleased, . and that as the power never was exercised during the life of Mrs. Ewirtg, and that the evidence shews that the slave was lent and not given, therefore, she and her family could not be subject to Ewing’s debts. "We do not deem it necessary to scan the evidence very minutely, to determine whether this slave, Hannah, was given of lent. There is testimony conducing to prove both sides of this question. A letter written by Ewing in 1791-, to Charles Wickliffe, acknowledges it to be a loan only, and the rest of the testimony on that side, arises "from the declarations of Charles and Lydia Wickliffe,’ and of Ewing and wife. Waiving the doubt whether any of this testimony is competent, we shall consider it as a loan only, and see whether the effects of it wil'Lnot be the Same in this case as a gift. For if she rem'ained-with Charles Ewing five years “ without demand made and pursued by due process of law,” then accordingffo tire letter of the act to prevent frauds and perjuries,isfie^and her family are subject to-Ewing’s debts. Wffito ’hot attach any importance to the inquiry, whether 'the-power given by the will of Martin Hardin, of disposing to their children, was or was-not exercised *i'n due form,, by Charles and Lydia Wickliffe, during-the lifeof Mrs. Ewing, and that for the following reasons: The‘same will which gave them-w life estate, also gave them a right or1 power to grUifjt'o their children ^consequently th’ey -had the power of lending to them, and if they-did so, and the possession under thát loan continued undistertK ed' for five years, the slaves, under the direction ofiihe ap-t, wofild become subject to the debts of Ewing. '-B!$ *359 ¿ície^* we are inclined,, to believe that the slave Frank, the another of Hannah,, and Hannah herself, were not subject,to the be.quest of the will of Martin Hardin, although such bequest is made.. F<br it is proved that on the1 marriage of Charles and Lydia WicklifFe in 1767, (‘thirteen years before the death of Martin Hardin,) Frank was put into their possession, and remained there undisturbed until this time; and Charles Wick-lifFe, in his original answer, treats these slaves as held in his own right, and the point, that they were affected by the will of Hardin, is an after-thought, which came hut in the amended answer, as a position supposed to be more favorable to his title as opposed to the creditors of Ewing. Of course the question of a.loan for five years, without writing recorded as the act directs,, is the remaining inquiry. Because the possession of a slave so long, gave to the holder a delusive credit, the statute intended to avert the .e-vil. The proof is clear,' that the general possession of the slave, Hannah, as well as her children, as they came into existence, was with Charles Ewing from ihe first of the year 1787, until about 1806 ©r 1807, or at all events until after the death of .Mrs. Ewing in 1804. And the proof is equally clear, tjiat they were by many, perhaps & majority of those who knew them, supposed to be the property .of Ewing, until after Mrs. Ewing’s death. This establishes conclusively the existence of the very evil which the act intended to remedy, and casts upon the opposite side, the necessity of proving clearly, that the possession and ownership were regained once within each five years, to ward off the effect of the statute. On this point the proof is not so clear of difficulty. It is shewn clearly, that in 1791, about four years after Ewing first got the possession of Hannah, an execution issued against the estate of Ewing, who was then absent from the country, and to avoid its effect upon Hannah, she was taken home to the house of Charles WicklifFe, and others sent at different times in her place; but in about the course of one year afterwards, when Ewing .bad returned and settled the debt, Hannah was restored to him. There is also proof that on one other occasion, one of the children of Hannah was taken from the possession of a person to whom Ewing had loaned the use of the child when small. There is likewise proof that Hannah was se$n afterwards at ¡he house of Charles *360 Wickliffe, bat whether in such manner as to give to Charles Wickliffe the exclusive possession and owner* ship, or only on those occasions of casual intercourse and visit, which mustiresult from the relation existing between the two families, is not shewn. To relieve the slaves from the effect of the statute, Hannah and her family ought to have been removed in such an open and public manner as could leave no doubt in whom the possession existed. We, therefore, conceive that Han-n.ah and her family are liable to the debt of Handle}', and that the court below did not err in so deciding this controversy.
Several objections and criticisms have been made to the decree, even admitting these slaves are liable, some of whig^gire just. That court has barely decreed that they shall be assets in the hands of the administrator, without placing them in his hands, when it is doubtful whether he couldyecover them; for as before suggested, a creditor might subject them to his demand, when the administrator could not recover them. Here was no decree which could be enforced against the slaves. The party holding the judgment, held it in the same situation in which it was, and if scirefacias should issue thereon, suggesting assets, it is very doubtful whether the administrator could or could not yet plead the want of assets at law. The decree ought, therefore, to have subjected Hannah and her children at once to sale, in satisfaction of the judgment at law, in the hands of the executors of Charles Wickliffe, as they on his death pending this suit, have become parties, and if their names or number are uncertain, an account ought to be taken to remove this uncertainty, and the executors be decreed to surrender them, to be sold under the decre-tal orders of the court, or enough of them to discharge the debt and all costs. We would further suggest, that the administrator of Ewing has neither admitted nor denied whether he has received personal assets since the judgment, but refers to his accounts settled with the county court. The account directed ought, therefore, to embrace this matter, and ascertain what has come to his hands, if any thing, that it may be appropriated first in satisiiaction of the judgment.
One or two more questions made and debated in argument, deserve.our consideration. Pending this suit in 1814, Handley entered into an article of agreement *361 witlx Jeroboam Beauchamp, in which he assigned and írÉ&sfarred to Beauchamp, the judgment which hé had cfff’Ewing’s administrator now in contest, and in consideration thereof, Beauchamp 'agréted that he would make to Handley, within a reasonable’ timé, a good, clear and indefeasible title to tjjc same--3150 acres §iés<ír?&ed in Ewing’s bond. ■ But ifBeauchamp should he unable ultimately to convey the land,' then he was. to pay Handley; whatever sum or sums of mongy he, Beau-champ,’might obtain by said judgment against Ewing’s estate, by this suit in chancerjU^or by setting oil- the judgment against Ithy demands the estada might have against Beauchamp. Beauchamp had before this suit was tried; succeeded in setting off upwards of three hundred' dollars against,-a claim which the estate of Ewing held against himw After the date of .this contract,* Handley died pending this suit, and it was,revived before trial, in the names of his two executors. Afte'r this-suit was argued and beiore the court for ad-visemehf, the administrator and heirs ©f Ewing >filed tbeir petition, praying the court to set aside the order of hearing and dismiss the suit, alleging that one of Jhe, executors of Handley had transferred and -assigned^K them the whole judgment against the estateof theirum’ testate, and also the benefit of the conlracWvith Jeroboam Beauchamp, and they exhibited a written transfer to that eifect*P:To oppose this, Beauchamp exhibited his petition, alleging that he had, been at considerable -Hosts and expehce in pursuing this suit, which was now conducted for his benefit, -and also in endeavoring to obtain the legal title for Handley, to the said two hundred.and fifty acres of land, which he yet had the'pres-peffljfpf obtaining; and also alleging that one of Hand-léypfllsxecutoúsbad disagreed to the transfer, and -show-edith&writm&:o£ that executor, requiring the suit to go on-fox Beauchamp’s benefit, and declaring that hé nev-erjdid-agree-to the transfer made by his co-executor;
'The-court below refused to dismiss-the suit, and went on to render a decree. It is now contended, that one executor had a right to transfer the demand, and therefore the court ought to have dismissed the suit; that as Beauchamp had not yet got the title to. convey to Handley’s representatives, by his own showing, the oney belonged to the estate of Handley, and therefore ie of his ’executors had.'a to transfer it. It-is *362 true, that one executor, where there are more than one, has ample powers by law, to transfer the goods of his testator or release a debt; but it does not thence follow, that either one or both executors could make such trans-per pn (jjjg instance, or that the suit ought to have been dismissed on the prayer of th^ defcndants below, if they had. The contract with Bekuchamp is a covenant for land, or money, in the alternative. Whether his executors have.a right to transfer it, or not, depends, according to the decision of this court in the case of Hatcher vs. Galloway, 2 Bibb 180, on,the question whether.that part which stipulates land, was broken by Beauchamp in the lifetime of Handley, which does not appear. But if it was, Handley may have done acts to waive the breach, and tbe.whole right of recovery thereon is to be ascertained the trial of a proper issue at law or in equity, as in other contracts, if the-court below had decided that the reasonable time given to Beauchamp had elapsed, and of course that Beau-champ was barely to collect the money and hand it over to Handley’s executors, it would have been forestalling the rights of the parties by’ motion, or at least by peti-t|p,p, and in a summary way concluding matters which ought to bnsettled on proper pleadings made up in the usual course'. It would have been deciding at once, ■without trial, that Beauchamp had forfeited his contract, or that his contract Was vitious, ala he had no right to the money. The court, therefore, did right in overruling this application, leaving the "rights of the parties not prejudiced, to be asserted in the usual way.
Finally, the question presents itself, whether the court ought to have given the heirs' of Ewing an'i|#e-lief on their cross bill, or whether, as both they’ annth'e administrator insisted upon Handley’s being compelled to restore possession before he received satisfaction of his judgment, their prayer ought to have been granted. In cases of rescisión of contract, the parties ought to be placed in slalu quo, as nearly as can conveniently’ be done. Here is not a rescisión asked, from,the decree of the chancellor; but there has been a performance on the payt of Handley’, and a recovery at law for a breach. In such cases, generally, on a recovery, there ought to be á restoration of the thing sold, subject to the lien of’ the purchaser for his purchase money. But as it does- *363 m§fppear thftf- Ewing had any title^o' the thing he-sold .oifght this case to form' an exception1? ít is-*not true, 'that Ewing, in this case, performed nothing. ‘Handley evidently tofok'posséssion undpr him, pnd Ewing had stipulated-to keep him there,’and‘he has .not been disturbed. Possession oflMdmay itself bécome a title,, and oftíjh cannot be divested; and although it is dencjin-inátecj' the least estate, it is one of gread importance,, and of course ought to be restored. Sucn has been the. requisition of this court, in the casq of Lyon vs. Humble, 3 Marsh. 468, in’^ich case,the vender had no title M' record- It *s true, that as Handley took possession un-. der Ewing, ho might be subject to eviction in an action at law, as was decided by this court in^|he case of Con-nelly’s heirs vs. Chiles, 2 $arsh. 242; biit still, although the heirs of Ewing may have remedy at law, it does not follow, that they cannot insist upon the samo matter in. e.qiiLty,; especially as the chancellor is asked for relief by tfié other side, and can finish the whole matter. Alexander Handley has the possession. He is made a parity by one of the amended answers, and relief prayed: against him as to the possession. Besides, he is oneof the executors of his father, and has become, a party a bill of revivor; he is, therefore, properkf/before the coüH, and wnconceive it reasonable that he ought to be compelled to.jBtjWe the possession, upon the payment of the purchasenlibney. But, before this’is done,*n account ought to~ be taken of improvements, and, rents aifd profits. Improvements, lasting and valuable, made before the judgment at law, ought to bfe assessed at th^i&gresent value, as they maybe deteriorated.by use o'É'hgpse of time; rents ought to be calculated qn the laneras it was. when sold, and not including rent’s'on the. Ihb'orand ameliorations of Handley, and also all. w^te committed during occupancy, and the balance decreed to the party in whose.favor it may fall; and-a decree ought to be rendered,. that Handley, restore the posses-: sion, subject to his lien for the purchase money, or any balance of improvements which may be in his favor; and on the amount of the judgment at law, costs and improvements being paid, the court may, by decretal, order, restore the possession to Ewing’s heirs. ' <
decree’ must, therefore, be reversed with^costs., ana the cause be lremande§*'th'at a decree may be the is entered m conformity wilmYbis opinion..
*364 The Hon.' Charles’A. Wkkliffe presente^; the follow-trig petition for a -re-hearing:
The court, in deciding upon two'questions involved jn tge record, 1st, the claim on the part of the defendants below, to red'uce the arifbunt of the common law judgment; 2d, the claim of the defendants to be paid for rents and(profits, and to be restored to the possession of the premises, has not furnished the defendants that relief to which, according to the principles of equity, it is respectfully believed by the undersigned, they were entitled. The main question involved having been so fully discussed by the court, it is deemed unnecessary to call their attention again to that part of the decree which determines the slaves “liable to the payment of the debts of the decedent, Ewing. Nor can it be important to trouble the court with a minute statement of the facts of the case. These will be found in the briefs filed. The defendants, in the nature of a cross bill, call upon the chancellor to reduce the claim of Handley to what, according to the principles of law and equity, he is entitled, viz. the purchase money and interest thereon'.
It will be first necessary to enquire, whether, in this case, under all the circumstances, the complainant, Handley, at law or in equity, should reoáper more than what he paid, and interest on the same. *'
When a failure to convey is the result of a fraudulent intention, the criterion of damages is the value of the land at the time of assessment. But when the contract was fairly and honesily entered into, and a failure to comply arises from causes not the result of fraudulent intention, thé consideration money and interest,’ is all the party at law can, and as much as in equity he should, recover.
In this cause, Ewing sold the land under an equitable interest, which he held in the fee, and which equity has been perfected by his heirs. He put the defendant into the possession of the land; that possession has not been disturbed for thirty years. Surely.there can be no fraud imputed to Ewing; none is proved. I assume it as a principle, not controverted or denied by the opinion w.liich the court has pronounced, but fairly to be inferred therefrom,- that, at;Iaw, if a4 fair and full de-fence had been made by the representative of Ewing, *365 g-l § ere' ® ts* '•o » “ g esp® » < O ry . >-! ^ ví1^ o í O • 3^'M g. ^ 2 S rt. o. «•» a,ft ® a " a ana su t>i o _S2^ cl>. t>. •*-< 5. qí , Ó < t¡ 4 S'", p” 15'"SÍ *'ír.(n “ .«rj» 2 »-3.<* 'g § a pL aiJ’-g gi «1 ^ ~ ” 5-^ „ .. „ a- O)
9? a ho ® ^ <¡r í, « ® ® <s re •'l'l-S-g I |^#3#73 S «H ^ cS- S'u ^ Q O, - ’ q/ p «2 JS i S> & ” T3 .« 2 rru .2 ^‘“‘TS. 'O S3 wO • » o <73 "»ag sfcT-> (t> Q P P ¿® fí) {3 h— co Í-P cr^.o J^n 2 r 2£Fii ^ * t- ^‘f* (í O M Cw ¡SB -iR'S o- O H, !§“ o s'g>® »• , __l re o *— ¡-y- ^ _ ',e tr-: B ^ ' S; O -a- S* * 3C Ct> <j p — i o , p O-i •j • # 9 ^3»? O rf - • 3 ® g “ Sii ® o 0 J, *“* (*f P rt-3 ¡C (3 S w tí' <■ — í 1 oSB^a ft Kn eO ^ S , Ctí ? £>'2.&'S^ g-' o O! Qj *-^> K- o- J=í f>? *-» = p p--P¿ n. 2 2. o- ® íü S.^asíi — to c Í3*. w ^ Z C! O f JO J3. c ^ -S - t *>*s -»-> rt p>t co M. Wí <-+. rfj, *-f5 p *3h tOS HACt> *sr* ^ O rr* © jqíWi* ere 2T g t-t- S2L» j-» ¿2- B ^r> >3*o. O ST ü* *3 *366 which the* chancellor, in. this cause, has' rightfull^en-tertained jurisdiction. When the defendant is again assailed with, the claim of the complainant, and that by an appeal to the conscience of the chancellor, can he not resist that recovery,|by gppealipg to the chancellor to compel the complainant to diáclose upon oath what is justly due? Is it too late to file a Bill of discovery in this cause by the defendant? The difference between the amount recovered and the purchase money and interest, forms an item large enough to deserve the attention and interposition of the chancellor.
.Upon the second prfint deemed objectionable in the decree pronounced, your petitioner asks the serious consideration of this court once more. He is justified in so doing, because of the fact,-that in the argument of the cause, he is informed little if any thing was said upon the subject, as to the extent ofthe appellants’ claim for rents. Their right to be paid,as an equitable one, 'and must result upon Handley’s being refunded his purchase money, and paid for his labor upon the premises. The right is expressly recognized by the court in the opinion pronounced; but is restricted by the mode prescribed by the court in such way, to possess only the name without the substantial qualities of an equitable fight. The court decide the appellants are entitled to he restored to the possession of the land j^it say, “ before this is done, an account ought to beriaken of the improvements, and rents and profits. Improvements, lasting and valuable, made before the judgment at law, ought to be assessed at their present value, as they may be deteriorated by use or lapse of time. Rents ought to be calculated on the land as it was when sold, ánd not including rents on the labor and ameliorations of Handley; and also, all waste committed during occupancy, and the balance decreed to the party in whose favor it may fall, and a decree ought to be rendered that Handley restore the possession, subject to his lien for the purchase money, or any balance for improvements, which may be in his favor,” &c.
As this cause does not come within any of the pro-, visions of either of the occupying claimant laws of this state, and is not so considered by the court in their opinion, we are relieved from the necessity of contesting the right of the complainantip be paid for his improvements under those laws, or their now validity. Tlis *367 máfeof ythepprtjes pre treated ipthis ¡cafiseyuM cor* rjpjtíy cbn?i^y;efhby .the court, as purely equitable, un-Épfied by. tbiq.se Jajys, or, unaffected by their •destruction'. Let us ea^ukq.yrhát.thaj; principle of áquibyr is, which has. goyemed. this court in former $ases,,‘anepihen.see if tbere^ is. any,'feet dr circ,m#stancp in this cause, wbicb does vary or change that principle. Talbot’s Cases in Equity.,|36, the lord,chancellor uses these words: “If, upon tlje prospect of haying the articles performed;, the plaintiff has improved tfie .estate,f«,,it is reasonable ,he should have an allowance for lasting improvements^'provided he iseqn,tenn.ó deliver up the articles, and to acr*, coujg; for th,e profits.”, Same principle recognized, in1 3d Eq. Ca. Ab. 681; 1 Remonda?. The right kÁe paid for improvements, subject to a charge for rents and profits of the land, in the/stnte in which ibis when rnsed and occupied by the tenant, is recognized by this court also, in the case of Whitledge vs. Wait's heirs, Pr. Dec. 1804, page 397. We find the principle settled by this ■ court in,the case of Saunders vs. M'Cracken, 4 Bibb 511. In that case, Saunders filed his bill in equity to compel' M’Craclcen to pay him for improvements by him made, under a parol contract for the land, entered into with'' Saunders, if a conveyance of the land could not be had. This court r.efuse a conveyance, and in pronouncing the decree, use this language: “ M’Cracken, before he is allowed to galpthe possession, ought to be compelled to compensate for the improvements remaining upon the premises. In estimating the amount, it will, however, he proper to deduct from the value of the improvements, a reasonable sum for the use of the miMnot for the1, use of the ground in the state in which the occupa# found it when he entered,; but for the use of the mill, • for which M’Cracken was decreed to pay rent, notrto be calculated on the land as it was when sold (by pa-rol); but a reasonable sum for the use of the mill.
Thompsons. Mason, 4 Bibb 199, is á case where the improvements were made upen the land by the occupants; yet they were< decreed to pay rents from the tinmof their taking possession,.n|gt restricted to “ a calculation on the land as it was when sold, and not includi ingirents on the labor and.ameliorations” of the occupant % <
Tápe case of Lewis’ heirs vs. Singleton's heirs, 2 Marsh. 215,"again recognizes the principle contended for, un» *368 fettered by the.restriction imposed in^the present case. The same principle is settled in 2d volume' o.f Mün-
T,he co(u,rt decree the complainant to. pay for all waste; bull is silent as teethe payment for the reduction of soil by cultivation, which would, not properly be taken in the estimate under the head of waste. The complainant has occupied the land.for thir'iyyears, undisturbed, under the contract with Ewing; the soil worn.out by unskilful cultivation; the court decree the complainants to pay for the improvements; in substance and fact refuse them rents, deny them a compensation for the reduction of soil. This cannot be equity or justice, in this or any other country.
If the equitable principle is correctly staled, and established by the authorities cited, differing in the period at which the charge for rents shall commence, according to the circumstances of each particular case, let us enquire whether there are any circumstances in this cause which will vary or change the rule heretofore settled by this and other courts. -
Ewing’s heirs are entitled to the land, and to them Handleyis decreed to restore it. M’Cracken, in the case in 4th Bibb, was entitled to the land, and had a judgment,for restitution; Handley was put into the possession and made the improvements, and he is decreed payment for them. Saunders was put into the possession, made the improvements, and payment therefor decreed. Here .the analogy ceases, Saunders was decreed to pay a reasonable sum for the use of the, mill he built; Handley is decreed to pay rents and .profits, “ calculated on the land as it was when sold, and not including rents on the labor and ameliorations of Handley f or, in other words, no rents. The,same analogy in circumstances and rights may be found in this and the other cases cited, until we come to the assessment of rents.
Why should not the appellants he paid for the rents and profits of the premises, in the state in which they had been occupied bysHandley? Is there any principle of equity which forbids it? Is it because lie, and not Ewing, lias made the improvements? If so, then I answer, that Ewing is compelled to pay him for those improvements. When a man performs labor, for i^ich I am bound to pay him, it is us though that labor had *369 beenpe ¡formed by myself. The most which the chan-cejlbf-could do, or ever has done, would be to’allow the improver inferest, after a reasonable time, upon the Value of the improvements, deducting, annually, the'* aniount of rents due, from the amount of improvements and interest thereon. **
If £he court be correct in the principle which governs courts of chancery, in this particular case, the state of Kentucky has sustained no loss by .the destruction of the occupying claimant laws by the federal court.’ In1 deed, it was idle in the legislature to pass those laws; for^ iby them, instead of bettering the condition of the occupants, their liabilities were greatly enhanced. Both the acts of'1797 and 1812 subjected the occupants to rents, at particular periods; rents, not calculated upon the' land as it was when the successful claimant was ousted by the occupant, but rents for the premises as they were when used and occupied, for the time rent is given. In this case, the court give no such rent. They give to the appellants, it is true, the rents and profits of their land; but hów are they to be estima^ ted? What is to be the matter of fact inquiry with the commissioner? Shall the circuit court be directed gravely to enquire into the value of the rents and profits ofthis 250 acres of land, considering it to have remained in the state it was in 1789, when Ewing sold it to Handley, a wild and perfect wilderness? Upon what data shall the court below direct the commissioner tq make his inquiry? The commissioner is told to report the rents and profits of the land, “ as it was when sold.” It was not cleared when sold, or taken possession of by Hand-ley; of course, the commissioner must report that the rents and profits ofthis land, for 30 years, are of no value, although the complainant has, during that period, used and occupied the same under Ewing’s title, and, in law, as his tenant at will. Why not át once saj' to the court below, that for the land in contest, as it was , not cleared at the time Handley took possession, the. appellants are not entitled to rents and profits? Do not amuse the appellants with the hope that they are to be paid for the .rents and profits of their land. Speak to them in plain and strong language; inform them that the courts* of chancery heretofore have not correctly uiJIerstood the doctrine which they have professed gov-, eras them; tell them that the cou#t of appeals of Ken- *370 lucky, in 1804, in every case since, and particularly iii the case óf M’Cracken vs. Saunders, 4 Bibb, have been mistaken, and it is now time that the doctrine so long practised, should be abandoned, and the true equitable principle, as now settled by this court,- hereafter be recognized.as the law of the land. The decisions heretofore pronounced, and which have been hastily cited, are wrong, if the one in this case be correct.
Where the is'bonTfide'a charge for’ substantial ing the rent, may be allowed,
It is with great reluctance, that the -undersigned has been compelled to trouble the court with this petition. He well knows the labors which this court have to encounter, and that applications to re-consider opinions deliberately pronounced upon full argument, tend to increase those labors, already insupportable. A sense of duty to those whose interest he represents in this cause, añd who are united to him by more than the ordinary obligations of lawyer and client, and the great importance of the principle which is involved in the Very few lines which close the opinion, will furnish to this court an apology for the trouble which this hasty and unconnected petition may give; and if it shall have the effect of opening the question once more for argument and discussion, it will not, even upon a second argument, prevent the court from then settling the doctrine as now decided; if they shall still believe it right.
For the reasons above, your petitioner moves for, and hopes this court will direct a re-hearing of the cause.
Respectfully,
C. A. WICKLIFFE JorApfis.
■Whereupon the opinion was suspended until the spring term 1824, when the Court pronounced the following opinion:
In responding to the petition filed for a re-hearing by the heirs of Ewing, we have not thought it ne-to notice all the points made and relied on; hut we conceive it proper to attend to the questions of improvements and ameliorations on the one side, and rents and profits on the other, to which the attention of CDUrt has been earnestly, but respectfully recalled, On these subjects, after the most mature deliberation, we conceive that the former opinion must be corrected,
of improvements not to be allowed beyond the amount of rents charged, *371 3^,that this is the rule of equity and common Jaw, ap-¡cable to such cases. We" are aware Shat the supreme court of the United States, ip the late case of, Green vs. Biddle, 8 Wheat. 1, has said that improve-pienls ought not to be allowed beyond the rents. If this is intended to apply to every case where an accou.ut of rents, profits and improvements is to be taken, with due deference to such high authorit}^ we.must say, that after a diligent examination, we have been able to find no case in other books, which negatives the right to extend the charge for improvements beyond ithe. rents and profits, except cases where the. possession, of the occupant was taken and held mala fide. Besides, the case then under consideration before that court, was one arising under the conflicting claims to land in this Country, where the possession of the occupant was, without the consent of the real owner. We, therefore, dismiss from this case, the influence of what is there decided, leaving its consideration to a similar case when it may occur;, for we are well satisfied, that as between venders and vendees, the doctrine, if correct, cannot apply, and i.n all cases of that kind, where the English chancery have directed an account, the excess of the value of improvements beyond the rents and profits, has not been disallowed, except the wrong was wholly on the side of the vendee. Such a rule for the account, has been acted on by this court at the. present tern),, in the case of Lancaster vs. Pope, &c. In this case, however, the vgrong, if any, was on the part of the ancestor of the petitioners. Handley purchased the land and paid for it, and because his vender had no title, he was driven to his action at law for remuneration. We, therefore, still conceive, that if there is an excess of improvements in his favor, it must be allowed, and that the former opinion is also correct in disallowing any improvements made after he obtained his judgment at law for the price sf the land.
J’f' Biddle, in the supreme upstates1*'13 wj,cre the possession' isntrary’lo the consent of the real own-erofthelund, and. continued throughout without, his consent, cannot be art authority in all (if any) cases between vender and vendee.
Where land has been pur», chased and paid for, and the vendee putin possession, but the vender cannot make title, and will not repay the purchase money without suit, if, after disaffirming the contract^ by obtaining, a, judgment for. the price , paid, the.a-, meliorations. made by the, vendee exceed the value of the fi^^hc^ouá-ht to be paid the excess.
*371 We also still continue to think, that we have r.ightly fixed the period at which the charge of rents must corm menee. It may be admitted thatrents and profits during occupancy, have been allowed as a general rule in the English chancery, and yet the concession will not conclude this case; for Maddock, in hi,s first volume, page 73, sayst ‘
dee to be allowed any thing for inentsVmade after having obtained ÍheSprioeof the land, and rent; ought to thatTime*3 at
As a general t'-^the' occu' pant of land is to be considered as tbe'realowner, in clearing, fencing it fit fbreulti-vation; and against the h-'is1 a"morai° ciaim for this, notasagainst a landlord, au employer,
After th® *>uMotobaen state for oul-tivation, the tíveen'üie'0" owner & *00-o.ipant are to he adjusted
« Under special circumstances, the court will only decree an account of rents and profits, from the time of bringing the billy as where the defendant had no notice of the plaintiff’s* title,.nor had the deeds and writings in his custody, in which the plaintiff’s title appeared, or w^ere the title of the plaintiff appeared by deeds in a stranger’s custody. So, where there hath been any default or laches in the plaintiff in not asserting his ti-tie, and he has laid by, the court has often thought fit restrain it to the filing of the bill.”
It is true, these exceptions are laid down by the au-(.Uor, as applicable to that class of cases usually called ejectment bills, where an adverse legal title is asserted in equity, because there is some impediment placed in the road of a legal title-holder, obstructing his recovery a* ^aw* But surely if such exceptions are made in these cases, the reason is equally forcible to except from the influence of the general rule, the case of the vendee who has reposed implicit confidence in the vender, and has supposed that he was really acquiring an estate by the purchase, and it turns out that he is de-C(dved’ and cannot have his contract, because,his vender has no title. Such cases have heretofore been made an exception in this court, especially when the fault Jay in the vender, which prohibited the performance of the contract. See Langley vs. Fox’s devisees, 3 Marsh, 388, and subsequent cases. On the contrary, when the fault.lies with the vendee, or he knew at the time of his purchase, of the defect or want of title, the general rule has been applied, as in the case of Thompson vs. Mason and wife, 4 Bibb 199. We, therefore, still apProve the direction of the former opinion, which directs the rents to commence at the time when Handley recovered his judgment at law on the contract, at which, t¡me he abandoned further hopes of title by recovering damages. With respect to the criterion to be faxed, by which both improvements and rents are to be charged by the decree, to wit, improvements at their present deteriorated Vfdue5 and rents and profits as the land was ^hen Handley first got possession, it is a subject of acknowledged difficulty, and one on which we have not keen a^e to derive any aid from adjudged cases; for while the right to payment for improvements on one side, and of rents and profits on the other, is acknowledged in all the cases, the criterion by which they are to *373 |¡®dcharged, doe's not appear tp have.been the subject ■ of express adjudication, except where-it ha,s been touph-qd by this court, in the case of Dupuy vs. Griffith, ,3 Marshall 177; and the subsequent case of Laudemari vs. M'Kinson. . After-reconsidering these pdinfs, wc -feel ourselves constrained to change the directions,of this decree,, and tofix on some-rule whichiwill be more generally applicable,-than that intimated in the case, just cited, of Dupuy vs. Griffith, and to-.leave that case, to be justified by the particular circumstances,:bnd not, as forming a precedent for every case; and so -far as it may differ from the general rule n'ow/laid down and attempt to establish, general principles, we do. not hesitate to depart from it. ‘ ;
qp thc-princi-ples which govern the re« lalion between landlord and tenant.
The cases of Dupuy vs. Griffith, 3 Marsh. 177, Richardson vs. M’Kinson, Littell’s S. C. 320, and this case, arc exceptions to the, general r.ulc.
.Tustice requires that many exceptions should be made..
Although we, as said before, have been able-to .derive but little aid from'authority, yet by an attention to the original principle, on which the claims for improvements, rents and profits, are based, we are furnished with a guide which will conduct us to a correct result. The right then to rents and profits in the successful claimant, must be based upon the right of property in the soil, adjudged to be in him, by the sentence of his recovery. In consequence of this, he is treated as the landlord, and the tenant or unsuccessful claimant, as a laborer or tenant, who had bestowed his capital and labor in ameliorating the land of the successful claimant,-and by this process, rendered it fit to produce the profits of the earth; and the excess of those productions, beyond what sustains the tenant in his annual labor, is nothing else than the rents and profits. These are fixed at different prices, in different places, where land is leased, Ijlce every other article, according to the demand. Then, as a compensation for his annual labor in cultivating, the occupant draws his subsistence, and the excess beyond what is necessary for this purpose, accrues to the true owner by the right of accession, in the language of the civil law. But the labor of the occupant in subduing the forest, fitting the land for cultivation, placing necessary buildings thereon, is not thus paid; for these he has a moral claim upon his adversary, who now, by the sentence of the court, stands, in* some measure, in the attitude of an employer. If the successful claimant is to receive rents, and not pay for this labor, he will be enriched to that amount, and have his rents from the labor of the tenant also, by which the occupant will sustain a clear losg to this amount'. The *374 labor and service, therefore, necessary and useful in fitting the land for occupancy and use, must be paid for by the true owner, at its real original ■ cost, without regard to deteriorations by use and lapse of time. We do not here include the cost of labor expended in making improvements that are ornamental and fanciful only, orto those entirely temporary in their nature. If the occupant expends either his labor or money on such, he must lose it.
According to this same standard, if the occupant is allowed pay for his labor and capital expended, at cost, it necessarily follows,-that he ought to, be charged with rents on the subject as improved by-bis own labor; and thus he renders labor for which he is paid; he receives his subsistence from his annual labor in his prop, and he accounts for the excess to the true owner.
But while we admit these as'the general principles, which ought to be applied, we deny their inflexibility in particular, and indeed in many cases, as before shewn. There is a necessity that they should often vary, lest injustice be done, and we conceive they must measurably yield in this case. For instance, the improvements must be valued at the time when the judgment at law was rendered; and of course, instead of fixing them at their original cost, they must be assessed at their value, taking into consideration their deteriorations, if any, at that time. Instead of commencing the rents on the subject improved, so soon as the improvements were made, they must commence at the same date when the improvements are to be valued, and be charged on the subject as then improved, and still be increased or diminished as the improvements increase or decrease, until the time of assessment, and thus equity will prevail. We also conceive that the tenant or occupant here must be charged with waste and injury to the premises, arising from his acts of badly treating the subject, or through bad husbandry, during occupancy. This last direction was casually omitted in the former-opinion.
It is decreed ánd ordered, that the petition for a rehearing be overruled, and that the former decree do stand unaltered, except that in the execution thereof in the court below, the proceedings must conform to the opinion now delivered, so far as xt varies from the former'npinion, and in other respects the former opinion of this court must pre.vail.